**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**CHRISTIAN MEYER THOMPSON,**

**Plaintiff,**

**v.**

**WOLFE & ASSOCIATES, INC.,**

**Defendant.**

**Case No. 2:24-cv-3325**

**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Jolson**

## OPINION AND ORDER

Consumer reporting firms purchase data about an individual's personal history, synthesize it into reports, and sell those reports to third parties. Businesses use these reports to make important decisions about the individual—whether and how to lend them money, whether to lease property to them, and, crucial to this case, whether to hire them. Plaintiff Christian Meyer Thompson applied for a job at Metro One Loss Prevention Services. In connection with reviewing that application, Metro One purchased a background check from Wolfe & Associates. The background check reported that Thompson possibly committed multiple felonies. He had not; but Metro One still did not hire him, even after things were cleared up. So Thompson sued Wolfe, charging two counts under the Fair Credit Reporting Act: one for failure to follow reasonable procedures in the initial investigation, and one for failure to make a reasonable reinvestigation. *See* 15 U.S.C. §§ 1681e, 1681i. Thompson now seeks partial summary judgment, and Wolfe seeks full summary judgment. (Doc. 36; Doc. 37). For the reasons explained below, the Court **GRANTS** in part and **DENIES** in part both motions.

## BACKGROUND

This all started in early March 2024, when Thompson applied to Metro One for a position as an unarmed security guard. (Def.'s Proposed Undisputed Facts, Doc. 37-1, #718). As a former member of the military, (*Id.* at #717–18), Thompson seemingly would be well suited for this role. Metro One evidently agreed, because after an interview on March 15, it offered him the job. (Resp. Def.'s Proposed Undisputed Facts, Doc. 43-1, #774–75; Pl.'s Exhibits, Doc. 35-4, #547). The offer, however, was conditional. Among other things, Thompson needed to pass a background check. (Doc. 37-1, #718). As is its usual practice, Metro One outsourced the background check to Wolfe. (*Id.*). That's when things went sideways.

The trouble in this case flows originally from some confusion about Thompson's name. For the background check, Metro One provided Wolfe with the name "Christian Thompson," along with Thompson's date of birth, and his social security number. (*Id.*). But, as the case caption suggests, Thompson also goes by "Christian Meyer Thompson." (*Id.* at #719 ("[T]he search yielded two name variations for Thompson.")).

Ordinarily, this wouldn't be a problem for Wolfe; it can use the DOB and SSN to confirm whether particular information actually relates to the person it is investigating. (Doc. 35-9, #586). And, for most of the information included in Thompson's report, those verification measures worked. (*See* Doc. 35-6). But Thompson had for a time lived in Los Angeles County, California. (Doc. 37-1, #717). Los Angeles is among a group of California counties that only permit online researchers of criminal records to view an individual's first and last name. (*Id.* at

#719; Doc. 35-10). And, while the County can provide individuals with a "record of no record" (RNR), documenting that they have no criminal history in the County, third-party researchers like Wolfe cannot request an RNR. (*See* Thompson Dep., Doc. 34, #420–21).

Wolfe's current background search director, Elizabeth McIlvaine, testified about the difficulties the company experienced in addressing the resulting problems. At the time Wolfe conducted Thompson's background check—mid-March of 2024, the change in what the group of California counties allowed online researchers to review had only been in effect for about a month. (McIlvaine Dep., Doc. 32, #339–40). And Wolfe had yet to develop a comprehensive policy about how it should treat L.A. County information in light of the change. At the time, it decided that the best it could do was "eliminate possible records based on the identifiers that we had," and then report the record if Wolfe's researchers "could not eliminate it." (*Id.* at #334). In other words, it used a sort of presumptive inclusion rule.

Consistent with that approach, in performing Thompson's background check, Wolfe searched for both name variations. "Christian Meyer Thompson" was clean. But someone named "Christian Thompson" had sustained two robbery convictions. (Doc. 37-1, #720; Doc. 35-6, #561). At the time of those convictions, the Thompson who is the plaintiff here resided on an Ohio army installation, though records searches indicated that he also had a presence in Los Angeles. (Pl.'s Proposed Undisputed Facts, Doc. 36-1, #690; Resp. Pl.'s Proposed Undisputed Facts, Doc. 42-1, #742).

Beyond that, Wolfe had nothing against which it could check the convictions. (Doc. 37-1, #719).

With no way to definitively rule out the convictions, it included them in its report to Metro One. (*See* Doc. 35-6, #561). Wolfe also provided, however, its standard warning. (*Id.* at #562). The warning states that a result of "No Reportable Records Found" means that Wolfe's "researchers could not locate a record that matched at least two personal identifiers (i.e., Name, SSN, Date of Birth, Address)." (*Id.*). It also explains that a report of "Records Found" means that Wolfe had "matched the personal identifiers listed for the subject in the above abstract." (*Id.*). The abstracts (brief summaries of each reported felony) identify the name on record as Christian Thompson and list nothing under the "other identifiers" heading. (*Id.* at #561). The warning concludes with a generic disclaimer that it does not guarantee the accuracy or truthfulness of the information and that "[f]urther investigation into additional jurisdictions, or utilization of additional identifying information, may be warranted." (*Id.* at #562).

With the report in hand, Metro One apparently was confused about how to proceed. Of course, as soon as it got the report (on March 18) it notified Thompson of the report and its damaging effect and directed him to contact Wolfe with any inquiries. (Doc. 35-5, #552). But beyond that, Metro One did not know exactly what to do. In part that may have been because the company's HR Director, Jewel Thurman, was new to the organization at the time. (Thurman Dep., Doc. 30, #218). At first, she and others within Metro One considered deciding on their own, without

waiting for an RNR, that Thompson could not have committed the reported crimes because he was in the Army and stationed in Ohio at the time. (*Id.* at #242–44; *see also* Doc. 34 at #481–82). However, they instead decided that Thompson needed to obtain an RNR. (Doc. 30, #235–36). But under Metro One's normal process, which it ultimately decided to apply to Thompson's case, even that would not be enough. (*Id.* at #246). The company would not take an RNR "at face value." (*Id.*). Rather, Metro One preferred to "rely on [Wolfe's] expertise" in "making the determination if the charges were Mr. Thompson's or not." (*Id.*). In other words, Metro One needed "a background check from Wolfe that meets our M-1 hiring standards." (*Id.* at #220).

While Metro One was deciding how to proceed, Thompson was doing his best to move things along. When he received the report on March 18,[1] he immediately disputed the felony records with Wolfe. (Doc. 32, #337–38). That was when Wolfe told Thompson to go get the RNR from L.A. County. (*Id.* at #338). He did so. While it took nearly a month, he eventually received the document in the mail. He then sent it to Metro One on April 17. (Doc. 35-13). That same day, Metro One sent it to Wolfe. (*Id.*). Wolfe, in turn, updated the background check and notified Metro One of the new results a day later, April 18. (Doc. 35-14, #601).

Yet even with the now-clean background check, Metro One still did not hire Thompson; and it offered him no explanation of why. (Doc. 34, #486–87). Rather, it simply stopped contacting him. (*Id.*). Metro One's last communication to Thompson

[1] There's some confusion about this, but the record shows that Thompson lodged the dispute on March 18 in the early afternoon. (*See* Doc. 35-15 (indicating that Thompson called the number 828-251-9898 on March 18, 2026, at 17:18 Coordinated Universal Time (2:18 PM, EDT)); Doc. 35-5, #552 (listing that number as Wolfe's)).

was on April 23, when its recruiter, Jim Wahl, informed him that Metro One had received the RNR. (Doc. 30, #258–59). By that time, though, it seems that Metro One had filled the position and "no longer had any vacancy." (*Id.* at #226–27). According to Thurman, Wahl later contacted Thompson about other positions, but by then Thompson had already found a job. (*Id.* at #227).

After all this, Thompson sued Wolfe under the Fair Credit Reporting Act (FCRA). (Compl., Doc. 1, #14–15). The FCRA is a federal statute that creates a private right of action for aggrieved individuals, and it provides for jurisdiction in any otherwise appropriate United States district court. 15 U.S.C. §§ 1681n, 1681o, 1681p. After substantial discovery, Thompson moved for partial summary judgment on all issues except for the amount of damages. And Wolfe likewise moved for summary judgment. Those motions are now fully briefed. So the Court has jurisdiction and the matter is ripe for decision.

## LEGAL STANDARD

Both parties seek summary judgment (although on Thompson's part, it is only partial summary judgment). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). So each party "'bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). One way to

do this is showing that the nonmoving party lacks evidence on an issue on which they bear the burden of proof. *Celotex*, 477 U.S. at 325; *Clark v. Walgreen Co.*, 424 F. App'x 467, 471 (6th Cir. 2011).

Once the moving party has met this initial burden, the nonmoving party cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (citation modified)). That is, the dispute must be both "genuine" (i.e., supported by evidence) and go to a "material fact" (i.e., a fact that could change the outcome). And in deciding whether there is such a dispute, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, the Court "must afford all reasonable inferences … to the nonmoving party." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

Putting all that together, the Court, after reviewing all the evidence, must determine whether there is some "sufficient disagreement" that requires submitting the matter to a jury. *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). And because each party seeks summary judgment, the Court in essence must consider the evidence twice—once in the light

most favorable to Thompson and once in the light most favorable to Wolfe. With that framework in mind, the Court can turn to the merits of Thompson's claims.

## LAW AND ANALYSIS

For the FCRA, Wolfe's business of selling background checks makes it a consumer reporting agency (CRA). 15 U.S.C. § 1681a(f). Thompson, as "an individual," is a "consumer" under the Act. *Id.* § 1681a(c). And the background check at issue here is a "consumer report." *Id.* § 1681a(d)(1)(B). The FCRA thus gives Thompson a variety of protections and imposes corresponding obligations on Wolfe.

Thompson claims that Wolfe violated two of the Act's requirements. (Doc. 1, #14–16). First, CRAs, when preparing consumer reports, must "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). Second, a CRA must conduct a "reasonable reinvestigation" when the consumer notifies them directly that they dispute the "completeness or accuracy of any item of information" the CRA has on file. *Id.* § 1681i(a)(1)(A). When that happens, the CRA has 30 days from the dispute to either confirm that the information is complete and accurate or, if the information is "inaccurate or incomplete or cannot be verified," to delete or modify that item of information. *Id.* §§ 1681i(a)(1)(A), (5)(A)(i).

Making things easy on the Court, the Sixth Circuit has held that claims for violations of §§ 1681e(b) and 1681i(a)(1) have overlapping elements. For the § 1681e(b) claim that Wolfe failed to follow reasonable procedures in its initial investigation, Thompson must show: (1) that Wolfe "reported inaccurate information"

about him, (2) that Wolfe "either negligently or willfully failed to follow reasonable procedures to assure maximum possible accuracy of the information," (3) that Thompson was injured, and (4) that Wolfe's "conduct was the proximate cause of" that injury. *Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938, 941 (6th Cir. 2018) (quoting *Nelski v. Trans Union, LLC*, 86 F. App'x 840, 844 (6th Cir. 2004)). For the § 1681i reasonable reinvestigation claim, the only difference is that, on the first element, rather than showing that Wolfe reported inaccurate information, Thompson must show that Wolfe *failed to remove* inaccurate information it had previously reported. *See Berry v. Experian Info. Sols., Inc.*, 115 F.4th 528, 536 (6th Cir. 2024).

One last point bears mention before diving in. To understand what the Court must decide, it will help to clarify the issues on which the parties seek summary judgment. Wolfe's motion is easy to understand. It seeks summary judgment on the merits of both claims. (Doc. 37). In short, it claims that for at least one essential element of each of Thompson's claims, there is no genuine dispute of material fact and Wolfe is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 325. Thompson, on the other hand, seeks summary judgment on only five specific issues: (1) that the report is inaccurate, (2) that Wolfe's initial procedures were unreasonable, (3) that he suffered harm (but not the amount of damages), (4) that Wolfe failed to reasonably reinvestigate the matter after Thompson's dispute, and (5) causation. (Doc. 36, #665). With that on the table, the Court turns to the merits of Thompson's claims.

## A. Triable Issues Prevent Summary Judgment on Thompson's Reasonable Procedures Claim.

Applying the four elements noted above, the Court concludes that genuine disputes of material fact prevent summary judgment on the reasonable procedures claim. The Court agrees with Thompson that the undisputed facts show that Wolfe reported inaccurate information. But triable issues remain for the remaining requirements: that Wolfe failed to follow reasonable procedures, that Thompson suffered harm, and that Wolfe's failures proximately caused that harm.

### 1. Reporting Inaccurate Information

Taking the elements in order, the Court begins with the threshold question of whether Wolfe reported inaccurate information. It did.

Thompson can meet this element in two different ways. He can show either (1) that Wolfe reported "patently incorrect" information about him, or (2) that the reported information "was 'misleading in such a way and to such an extent that it could have been expected to have an adverse effect on the consumer.'" *Twumasi-Ankrah*, 954 F.3d at 942 (quoting *Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001)) (citation modified).

Arguably, Wolfe's report of felony records in Thompson's file was not "patently incorrect." The report's warning, albeit in a roundabout way, alerted Metro One that "'Records Found' means that our researchers found a record … that matched the personal identifiers listed for the subject in the above abstract." (Doc. 35-6, #562). The abstract in turn, left the "other identifiers" heading blank. (*Id.* at #561). So the content of the report was true, if only in a literal sense—Wolfe found records

matching the name "Christian Thompson." (*Id.*). But even supposing there was a colorable argument that this saved Wolfe's skin on the "patently incorrect" front, courts agree that mixing a different person's records into a report makes the report inaccurate or misleading in a way that could have an adverse effect on the consumer. *See Ramirez v. Experian Info. Sols., Inc.*, No. 4:25-cv-443, 2026 WL 833868, at *2–3 (N.D. Tex. Mar. 26, 2026); *Lopez v. Experian Info. Sols., Inc.*, No. 19-cv-1954, 2022 WL 1569285, at *5 (N.D. Cal. May 18, 2022); *Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 330 (D. Conn. 2009). So that element is met as a matter of law on the record here.

### 2. Negligent or Willful Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

This second question lies at the heart of this case, but finding its answer is no easy task. As the Sixth Circuit put it in its leading FCRA case, "[w]hat constitutes a 'reasonable procedure' on the part of CRAs to investigate and ensure maximum possible accuracy, remains an open question." *Berry*, 115 F.4th at 538.

A few landmarks are relevant here, however. First, the standard looks to the "reasonably prudent person" in the same "circumstances." *Bryant v. TRW, Inc.*, 689 F.2d 72, 78 (6th Cir. 1982) (quoting *Thompson v. San Antonio Retail Merchs. Ass'n*, 682 F.2d 509, 513 (5th Cir. 1982)). Second, we know that for a legally identical investigation under § 1681i, the CRA must do "more than simply includ[e] public documents in a consumer report or mak[e] only a cursory investigation into the reliability of the information" it reports. *Berry*, 115 F.4th at 539 (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 713 (3d Cir. 2010)). Relatedly, the Sixth Circuit has

made clear that CRAs can rely on third-party furnishers of information. Such reliance is "reasonable so long as the information is not 'obtained from a source that was known to be unreliable' and is 'not inaccurate on its face' or otherwise 'inconsistent with the information the [CRA] already had on file.'" *Hammoud v. Equifax Info. Servs., LLC*, 52 F.4th 669, 675 (6th Cir. 2022) (quoting *Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1240 (10th Cir. 2015)). Beyond that, a willful violation requires that the CRA run "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Smith v. LexisNexis Screening Sols., Inc.*, 837 F.3d 604, 610 (6th Cir. 2016) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007)). So it makes sense that a less severe negligent violation requires only "carelessness." *Id.* at 611.

The natural starting point here is Wolfe's assertion that it was entitled to rely on L.A. County's records in making the report. (Doc. 37, #711). If L.A. County was not "known to be unreliable" and the information was neither "inaccurate on its face" nor inconsistent with what Wolfe already knew, then Wolfe's reliance was reasonable. *Hammoud*, 52 F.4th at 675 (quoting *Wright*, 805 F.3d at 1240). The Court can begin and end with the first requirement—known reliability. Wolfe seems to admit (outside of this specific portion of its brief) that L.A. County was not a reliable source of information. Soon after L.A. changed its policy, Robert Vanuka, then Wolfe's director of background screening, published a memo to its customers that stated: "[a]ccurately matching records becomes more challenging, if not unworkable, without specific details like the month and year of birth." (Doc. 35-10; *see also* Doc. 32, #358). And as

the current director understood things, the change made it impossible "to confirm, one way or the other, whether records were associated with an applicant, so any records from Los Angeles County should not be considered necessarily to be associated with the person in question." (Doc. 32, #359). This makes sense. Wolfe usually requires its investigators to match at least one other identifier beyond a name before it considers a record reportable. (*Id.* at #353; Doc. 35-9). Names, after all, are hardly a unique identifier.

But while Wolfe's first argument is that it was entitled to rely on L.A. County's records, Wolfe also seems to suggest that it actually took additional steps. So, even if L.A. County is not a reliable source, that would not necessarily mean that Wolfe's procedures were overall unreasonable, which is the ultimate question here. True, the unreliability of the source may go a long way toward showing that Wolfe's procedures in using records from that source were unreasonable. But the record also shows that Wolfe tried its best to corroborate the records with what little other information it had. And that may be what "a reasonably prudent person would do under the circumstances," which is all that the statute requires. *Bryant*, 689 F.2d at 78. So on these facts, where Wolfe had nothing against which to judge the L.A. County report, it makes sense to examine whether Wolfe's efforts were reasonable after all.

Seeking to cut that line of thinking off at the pass, Thompson invokes two traditional methods of assessing due care to show that Wolfe's process was lacking. The first is the care taken by others in the situation (i.e., industry standards). Second

is the relatively light burden of alternative courses of action compared to the gravity and likelihood of harm to which Wolfe risked exposing consumers.

Start with the former. Wolfe is accredited by the Professional Background Screening Association. (Doc. 32, #356). To secure that accreditation, a CRA must have policies in place that, among other things, reasonably "assure maximum possible accuracy when determining the identity of a consumer who is the subject of a record prior to reporting the information." (Doc. 35-8, #574). "Reasonable procedures to assure maximum possible accuracy," according to the association "must include" (1) matching at least two identifiers when one is the individual's name, or (2) "[a]ny reasonable procedures that are demonstrably as effective as" matching two identifiers. (*Id.*). Wolfe reported the record because "[t]he identifiers that we had and were available to us did match." (Doc. 32, #356). But it is hard to understand how name-only matching could be "demonstrably as effective as" two-identifier matching. (Doc. 35-8, #574).

Indeed, plenty of evidence suggests the contrary. Beyond common sense, Thompson offers the report of his expert, Evan Hendricks (Doc. 35-18). He points to studies and administrative actions demonstrating that name-only matching can often cause CRAs to include the records of others in an individual's consumer report. (*See id.* at #621–23). It is easy to see why—as the CFPB put it, "[m]atching errors are particularly common when using name-only matching because many consumers have the same or similar names." Fair Credit Reporting; Name-Only Matching Procedures, 82 Fed. Reg. 62468, 62469 (Nov. 10, 2021).

Second, consider the benefits and burdens of alternate avenues open to Wolfe. Since this debacle, Wolfe implemented two L.A.-specific procedures. Both reduced the risk of inaccurate reports. First, Wolfe tried notifying the consumer first about criminal records resulting from a name-only match. (*See* Doc. 35-11, #590–91; Doc. 32, #361–62). If the consumer denied that the records related to them, then Wolfe gave them directions on how to obtain an RNR and five days to do so. (Doc. 35-11, #591–92). If the consumer did not get the RNR within five days, then Wolfe reported the record as disputed and issued a warning to the client that explained everything and stated explicitly that "[a]s a result, we cannot verify if the name match is associated with the consumer." (*Id.* at #593). Wolfe also made clear to the client that it should not rely on the report to take adverse action against the client without first "providing an opportunity to discuss the case as to whether it relates to the consumer." (*Id.* at #594). If the consumer did not live in L.A. County, then Wolfe added a note to that effect and stated that "the ability to physically go to the Los Angeles County Courthouse may not be practical." (*Id.* at #595).

Wolfe later abandoned that L.A.-specific procedure and has now settled on something even more effective. Wolfe has taken the RNR out of the equation and now only reports records that, on their face, are supported by multiple matching identifiers. (*See* Doc. 32, #363). It does this by outsourcing background checks in L.A. County to a vendor able "to produce records that match [Wolfe's usual] procedures." (*Id.*). Apparently, L.A. County's policy change only relates to free online searches. The County permits people "to go to the court in person and purchase the court

proceedings to get additional information." (*Id.* at #363–64). So Wolfe pays a per-search fee to get normal, policy-compliant information out of Los Angeles County. (*Id.* at #364).

And Wolfe had yet another option at the time of Thompson's report. In addition to finding ways to report L.A. County records, Wolfe could have decided simply not to report L.A. County records at all, unless and until it could so with sufficient accuracy to meet its usual standards. That is, it could have implemented a presumptive-exclusion rule rather than a presumptive-inclusion rule. True, this would hinder its efforts to supply its client with as much information as possible, but it would be a safe way to assure the "maximum possible accuracy of the information" in its report. 15 U.S.C. § 1681e(b).

Of course, Wolfe's obligations are not unlimited. The FCRA does not require investigation beyond the bounds of reasonableness. In other words, Wolfe's processes need only "strike the right balance between ensuring accuracy and avoiding 'an enormous burden' on consumer credit reporting agencies." *Hammoud*, 52 F.4th at 676 (quoting *Childress v. Experian Info. Sols., Inc.*, 790 F.3d 745, 747 (7th Cir. 2015)). Industry standards are merely evidence of reasonableness rather than the be-all and end-all. And Wolfe's later adoption of procedures that lessened the risk of inaccurate reporting, while suggesting that alternative measures were potentially feasible, do not suffice to show that Wolfe's initial practice was necessarily unreasonable.

So, making all reasonable inferences in Wolfe's favor, a jury could conclude that Wolfe complied with the FCRA's mandate. To be clear, something more than

name-only matching is required, at least when more is available. *See, e.g.*, *LexisNexis*, 837 F.3d at 610 (noting that requiring additional identifying information is "an inarguably reasonable procedure" because the CRA already had additional identifiers on file). But Wolfe here did not face a normal situation. For online records, L.A. "does not provide any identifiers on records other than first and last name and occasionally a middle name." (Doc. 32, #335). And middle names are not searchable even if they sometimes appear on returned records. (*Id.*). This was a novel scenario. L.A. County had just enacted this change, and, as shown by Wolfe's growing pains en route to adopting the current outsourcing policy, it was puzzled about how to proceed.[2] And because these searches were customarily performed online, it's unclear whether Wolfe is even chargeable with notice that it could have sent someone physically to the courthouse as it now does. Against this backdrop, Wolfe decided to eliminate as many records as it could "with the identifiers [it] had" and send the remainder to its client. (*Id.* at #334). And its warning to Metro One, while not a model of clarity, (*see* Doc. 32, #334), put Metro One on notice that only name-matching supported the felony records, at least when combined with the records' abstracts. (Doc. 35-6, #561–62).

"[M]aximum possible accuracy" does not mean "perfect accuracy." And "reasonable procedures" does not mean "perfect procedures." It is possible that, in

[2] And it appears unlikely that Wolfe was alone in its confusion. While, rather shockingly, neither party developed evidence of how other CRAs addressed the change, Thompson's expert cites the initial reaction to L.A. County's policy. (*See* Doc. 35-18, #619–20 n.3). Even this presumably selective sampling of quotes illustrates that the County plunged the industry into uncharted waters.

this novel situation, Wolfe met these burdens. Deciding whether that is so is a task for the jury.

### 3. Injury

The third element requires Thompson to demonstrate that he has suffered some real injury. *Twumasi-Ankrah*, 954 F.3d at 941. Thompson claims to have suffered both emotional injuries and lost wages. (*See* Doc. 34, #434, 458). Start with Thompson's emotional injuries. "[D]amage to [one's] name and consequent anguish and humiliation" is a cognizable injury under the FCRA.[3] *Bryant*, 689 F.2d at 79. And the same is true of other emotional injuries. For example, depression, stress, and shame flowing from "financial woes" count. *LexisNexis*, 837 F.3d at 611. The main hurdle is that FCRA plaintiffs need more than "mere conclusory statements" to support their emotional damages claims. *Id.* (quoting *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 361 (6th Cir. 2005)). Thompson "must 'reasonably and sufficiently explain the circumstances' surrounding [his] emotional injuries." *Id.* (quoting *Bach*, 149 F. App'x at 361).

On that front, Thompson testified about his feelings when he reviewed the report:

> I was shocked because I'd never committed any sort of felonies let alone robbery. And I was humiliated because I, and my family, don't know anyone who was convicted of felonies. And also I really wanted to get a job and not appear to be a bum to my family, I guess.

---

[3] After all, who could forget? "[T]he loss of one's good name is beyond price and makes one poor indeed." *Bryant*, 689 F.2d at 79 (quoting 116 Cong. Rec. 36570 (1970)).

(Doc. 34, #434). In short, Thompson says he felt "anguish, humiliation, anger and frustration, [and] annoyance and embarrassment" when the false record was reported to Metro One. (*Id.* at #455). Beyond the initial shock of being labeled a felon, Thompson discussed being "too depressed" to do very much for the three or four months after Metro One rejected him. (*Id.* at #452). This severe depression waned, but Thompson claims he still felt stress and insecurity up until he secured a reliable steady income. (*Id.* at #453–54). At that point, he felt a sense of relief because he could repay a loan he'd taken from his grandmother and begin to save money. (*Id.* at #454).

Under very similar circumstances, the Sixth Circuit upheld a jury's finding of emotional distress in *LexisNexis*. There, the plaintiff testified about his depression due to "financial woes," his shame from borrowing money from family, and his embarrassment from being labeled a felon. *LexisNexis*, 837 F.3d at 611. "This situation, and particularly the financial hardships" it involves, the Court explained, "is one with which reasonable jurors could identify and infer that a reasonable person in the same situation would suffer emotional distress." *Id.* Moreover, Thompson's allegations are not merely conclusory; he has offered specific sworn testimony that creates a genuine dispute of material fact over whether he suffered emotional injury. Conversely, however, because the truth of this injury's existence depends on whether Thompson is a credible witness, the Court declines to conclude that he has suffered emotional harm as a matter of law. That again is a matter for the jury to decide.

Consider next Thompson's claim of lost wages. These losses are cognizable as well. *See LexisNexis*, 837 F.3d at 612. For this issue, the Court need not address the exact reckoning of Thompson's lost wages. With the emotional injury analysis eliminating the possibility that Wolfe's motion will succeed based on absence of injury, the question for Thompson's motion—which disclaims summary judgment on the amount of damages—is whether Thompson lost wages at all. Wolfe doesn't even contest that narrow question. After all, plaintiff was unemployed for over four months after the Metro One rejection. (Doc. 34, #459). Instead Wolfe put all its eggs in the causation basket. To that issue the Court now turns.

**4. Causation**

All agree that to succeed on his § 1681e(b) claim, Thompson must prove that Wolfe's conduct proximately caused his injuries. *Twumasi-Ankrah*, 954 F.3d at 941. It almost goes without saying that the injury must flow from the inaccuracy, which in turn must flow from the (potential) failure to follow reasonable procedures. *See id.* at 944; *Bryant*, 689 F.2d at 79.

The parties have varying accounts of the evidence here to say the least. Wolfe points out that Metro One had the RNR before its final communication to Thompson and offered him no explanation for why he wasn't hired at that point. (Doc. 37, #707). So, Wolfe says, the true cause of his injuries is unknowable—at least to anyone other than Metro One. (*Id.* at #711–13). Thompson argues that the causal nexus is clear: By the time Thompson's name had been cleared, Metro One no longer needed new security guards. (Doc. 43, #768–69). So, because the inaccuracy in the background

check caused a delay of about a month, Wolfe's failure to follow reasonable procedures resulted in Metro One filling the position before Thompson was cleared. (*See id.*).

The causal story here requires a few steps. First, Wolfe's procedures must have caused the inaccuracy; second, the inaccurate report must have caused the delay; third, the delay must have caused Thompson's non-hiring. At least one of these steps is easy: the Court must assume for this discussion that the procedures caused the report to be inaccurate. The others, however, require a more involved discussion of the facts.

Recall the timeline. Metro One gave Thompson a firm offer of sorts on March 15, 2024. (Doc. 35-4, #547). That offer was contingent only on a few ministerial tasks—obtaining guard licensing and registration, providing fingerprints, and passing the background check. (*Id.*). Thompson accepted. (*Id.*). On March 18, Metro One informed Thompson that it might not hire him because of the felony records included in Wolfe's report, which Wolfe filed that same day. (Doc. 35-5, #552; Doc. 35-7, #566). Also on March 18, Wolfe instructed Thompson that he needed to get an RNR from L.A. County. (*See* Doc. 34, #420; Doc. 35-15). The RNR arrived almost a month later, at which point Thompson promptly sent it to Metro One, and Metro One, in turn, promptly sent it to Wolfe. (Doc. 35-12; Doc. 35-13). After Metro One responded to Thompson to confirm receipt of the RNR several days later, it did not contact him again about the position. (Doc. 30, #258–59; Doc. 34, #486–87). Lining that up with Metro One's internal processes and communications shows that Thompson's proximate cause theory is correct as to at least some of his harms.

First, take some of his emotional injuries. His humiliation from being labeled a felon was complete when Wolfe sent the report. So causation is met for this theory of harm. The second category of harms—those tied to his unemployment—take some more digging. But Thompson has created triable issues for these as well.

Step one is showing that Wolfe's negligence caused the delay. To that end, Thompson offers evidence that Metro One was substantially certain to onboard him quickly after he passed the background check. First, and most obviously, Metro One made the job offer conditioned only on (1) Thompson's passing a drug test, (2) the background check, and (3) him getting a guard license. Within a week, Thompson had satisfied the first and third—he took his drug test, (Doc. 35-4, #550), and the state licensed him to be a security guard, (*see* Doc. 34, #482). All that remained was the background check, which Thompson could not pass until he received the RNR from L.A. County.

And Metro One's internal communications likewise support an inference that it wanted to fill the position quickly—that Thompson's onboarding would be rapid once he passed the background check. For example, on March 22, HR Director Thurman began trying to find ways to hire Thompson without waiting for the official RNR. In an email to Metro One's CPO,[4] she explained that it was unlikely that our Thompson could be the culprit in the L.A. County robberies because he was stationed in Ohio with the Army at the time. (Doc. 30, #243). She sought to hire him based on his certificate of discharge rather than waiting for L.A. County to send the RNR. (*Id.*

---

[4] For the uninitiated, that stands for 'Chief People Officer.' (Doc. 30, #241).

at #210, 240–41). She explained that "[t]hey would like to start him tomorrow at a new site that we are staffing with an affiliate." (*Id.* at #243). Metro One's policy of requiring a proper, clean background check, however, won out. (*See id.* at #244, 220). On this record, a jury could easily conclude that the background check, and its accompanying problems, caused the delay.

Step two is showing that the delay caused Thompson's non-hiring. On this, Thompson offers more of Thurman's deposition testimony. Answering why Metro One didn't just hire Thompson on April 18, after it received the updated background check, she said:

> The job that Mr. Thompson applied for was no longer available. It was for a new client account that we were doing a push to hire as many officers as possible in order to meet the client's needs. So the position, which was really a pool that Mr. Thompson was applying for, no longer had any vacancy; but Mr. Wahl reached out to Christian to see about his availability and interest in other opportunities with us,[5] and it's my understanding from talking to Mr. Wahl that Mr. Thompson had found alternative employment by that time.

(*Id.* at #226–27). Explaining that further, Thurman stated that she didn't "have the details on the exact date that the account started up, but generally" Metro One aims to fill similar pools of guard positions "sometimes within a two-week period, if that, so fairly quickly." (*Id.* at 228–29).

So Thompson has offered sufficient evidence for a jury to conclude that the delay caused Metro One not to hire him. But, reading the record in the light most favorable to Wolfe, the Court cannot conclude that Thompson has conclusively shown

[5] The record doesn't speak to the exact timing of these communications. But it appears that they did not happen until well after Thompson's initial run-in with Metro One in the spring of 2024.

this. The inquiry is proximate causation, not merely but-for causation. *Twumasi-Ankrah*, 954 F.3d at 941. A reasonable person may not anticipate or foresee a month's delay causing this large an issue. So a reasonable jury could conclude that Metro One's rapid hiring process was not reasonably foreseeable, breaking the causal chain. This would restrict Wolfe's liability to Thompson's shame-based reputational injury whose causal chain, to reiterate, was complete when Wolfe reported the false records.

Moving on, step three is showing that Thompson's non-hiring caused his claimed injuries. His lost wages injury theory is easy to understand. After losing the opportunity with Metro One, Thompson did not secure alternative employment for over four months. (Doc. 34, #459). And this wasn't for lack of effort. While Thompson declined several interviews when it appeared Metro One was about to hire him, Thompson continued applying to jobs after things went south with Metro One. (*See id.* at #436–39).

For his emotional injuries—at least those flowing from his financial troubles rather than directly from the false report—the analysis is mostly the same. There are two added wrinkles: (1) his financial difficulties could have been caused or compounded by things unrelated to his joblessness, and (2) these injuries are not as foreseeable as the others. The first problem, it turns out, is unimportant, as there is little evidence in the record suggesting alternative sources of financial problems. And Wolfe does not point to anything that cuts against that conclusion. The second added difficulty, the Court concludes, is not fatal. True, the emotional problems of joblessness are unlikely to be front-of-mind for a reasonable CRA, which will

naturally be more conscious of the risk that they might inflict reputational injuries or joblessness on an applicant. But the Sixth Circuit already concluded that such injuries are recoverable. *See LexisNexis*, 837 F.3d at 611. And, on the face of things, there are no special circumstances present here that would justify distinguishing *LexisNexis*.

So, to wrap up, (1) Wolfe reported inaccurate information, (2) genuine disputes of material fact preclude summary judgment for either party with regard to the reasonableness of Wolfe's procedures, (3) Thompson at least suffered lost wages, but triable issues exist as to whether he truly suffered emotional harm, and (4) triable issues exist on proximate cause because the record permits a conclusion that the circumstances giving rise to Metro One's rejection of Thompson were not reasonably foreseeable for someone in Wolfe's position.

### B. Thompson's Reasonable Reinvestigation Claim Fails Because Wolfe's Reinvestigation Did Not Cause Any Harm.

Thompson's second claim requires a lot less work from the Court than his first. To review, he argues that Wolfe failed to make a reasonable reinvestigation when he disputed the felony records. The elements of this claim are basically the same as the first, save for one. Thompson must show (1) Wolfe reported inaccurate information, (2) after he disputed the information, Wolfe negligently or willfully failed to use reasonable procedures for assuring the information's accuracy, and (3) this proximately caused Thompson to suffer an injury. *Berry v. Experian Info. Sols., Inc.*, 115 F.4th 528, 536 (6th Cir. 2024). Beyond that, the FCRA's reasonable reinvestigation requirement gives consumers like Thompson certain procedural

guarantees. Relevant here, if, after reinvestigation, "an item of information is found to be inaccurate … or cannot be verified," the CRA shall "promptly delete that item of information from the file of the consumer." 15 U.S.C. § 1681i(a)(5)(A). The CRA has only 30 days from receiving notice of the dispute to reinvestigate and remove the disputed information if it is inaccurate. *Id.* § 1681i(a)(1)(A).

As noted, the reinvestigation analysis is simple. In short, the reasonableness of Wolfe's reinvestigation is irrelevant because Wolfe ultimately removed the disputed information from the report. (Doc. 35-14, #603). The (possibly) shoddy reinvestigation thus caused Thompson no harm.

He has a procedural argument, however. He notified Wolfe of the dispute on March 18, but Wolfe did not remove the disputed inaccurate information from the report and make it available to Metro One until April 18. (*Id.*); *see also supra*, n.1. Wolfe had to act on the disputed information "before the end of the 30-day period beginning on the date on which [it received] notice of the dispute from" Thompson. 15 U.S.C. § 1681i(a)(1)(A). So Wolfe corrected the report one day late.

Thompson's claim about this violation fails as well. This is because the additional day's wait did not proximately cause any harm. Obviously Thompson cannot tie his emotional injuries from being labeled a felon to this error, as it did not involve reporting inaccurate information. And his later harms also fail. Metro One had the RNR in hand on April 17, and it knew that the corrected background check was on its way. (*See* Doc. 35-13, #599 (Metro One representative stating that "we have record from CA that the background name match was incorrect for this candidate –

please update the record and send me the clean background")). So Metro One had certain proof that the background check's flag was erroneous within the 30-day period. Even if, rather implausibly, Metro One filled the final position for which Thompson was vying in the less-than-24-hour interim, then Metro One's conscious decision not to wait a single day is the immediate cause of Thompson not getting the job, not the inaccurate information in the report. Thus, Thompson's § 1681i claim fails.

* * *

Triable issues prevent the Court from granting summary judgment to either party for Thompson's § 1681e claim. There are genuine disputes of material fact about the reasonableness of Wolfe's procedures, the existence of some of Thompson's injuries, and the causal link between Wolfe's negligence and some of Thompson's injuries. However, Thompson's § 1681i claim fails because no violation of that section caused Thompson to suffer harm.

Reviewing each issue identified on which Thompson sought summary judgment, the Court finds that: (1) Wolfe's reporting was inaccurate, (2) there is a genuine dispute of material fact over whether Wolfe followed reasonable procedures to assure maximum possible accuracy, (3) some of plaintiff's damages—lost wages to be specific—exist beyond doubt, while the others are genuinely disputed, (4) any failure by Wolfe to reinvestigate Thompson's dispute is immaterial because Thompson's 1681i claim fails on proximate cause, and (5) some of Thompson's injuries were proximately caused by Wolfe, assuming that Wolfe failed to follow reasonable procedures, while others, even under that same assumption, are genuinely disputed.

## CONCLUSION

The Court **GRANTS** Thompson's Motion for Partial Summary Judgment (Doc. 36) in part and **DENIES** it in part, according to the above. And the Court **GRANTS** Wolfe's Motion for Summary Judgment (Doc. 37) as to Thompson's § 1681i claim but **DENIES** it as to Thompson's § 1681e claim.

**SO ORDERED.**

September 29, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**